[No. C068866. Third Dist. Dec. 13, 2012.]

SUANN PRIGMORE et al., Plaintiffs and Respondents, v.
CITY OF REDDING et al., Defendants and Appellants.

[No. C068873. Third Dist. Dec. 13, 2012.]

AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA
et al., Plaintiffs and Respondents, v.
CITY OF REDDING et al., Defendants and Appellants.

## Counsel

Richard A. Duvernay for Defendants and Appellants.

Timothy R. Pappas and Kevin T. Snider for Plaintiff and Respondent Suann Prigmore.

Davis Wright Tremaine, Thomas R. Burke, Ambika Doran; Alan L. Schlosser and Linda Lye for Plaintiff and Respondent American Civil Liberties Union of Northern California.

## Opinion

**DUARTE, J.**—At issue in this case is to what extent defendants may limit plaintiffs' disseminating of leaflets on the outdoor grounds of the Redding

Municipal Library (the Library). To regulate leafleting on the Library campus, the City Council of Redding, acting as the Library's board of trustees, adopted an outdoor public forum policy (the Policy). Among other restrictions, the Policy limited leafleting to a specific "free speech area" in front of the Library, prohibited leafleting involving solicitation, banned leafleting of vehicles in the parking lot, and prohibited "offensively coarse" language or gestures. It also required (restricted) online reservations for use of the "free speech area."

Two organizations (and certain of their members) separately challenged these portions of the Policy. Each organization obtained a preliminary injunction enjoining enforcement of these portions of the Policy and other regulations. On appeal, the City of Redding and other defendants contend the trial court erred in finding the Library was a public forum, and that even if the classification as a public forum were correct, the court misapplied the intermediate scrutiny standard to the challenged portions of the Policy. Defendants further contend plaintiffs did not have standing to challenge provisions of the Handbill Ordinance and the preliminary injunctions are overbroad.

As we will explain, we conclude the trial court correctly found the area outside the Library to be a public forum, and, with one exception, correctly found plaintiffs were likely to prevail on the merits in their challenges to the Policy and the Handbill Ordinance. The one exception is the ban on leafleting in the parking lot. We shall uphold that provision of the Policy. To the extent the preliminary injunctions are overbroad, we cure the problem by striking the offending language. Accordingly, we shall modify the preliminary injunctions and affirm as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Library*

The Library opened in 2007 at 1100 Parkview Avenue in the City of Redding. It borders public parks on three sides. South City Park is to the west and south; there is an asphalt road separating the Library from the park to the west. On the east is Parkview Avenue. To the north is Grape Avenue; across from Grape Avenue is a large softball field and next to that field is a city hall complex.

The entrance to the Library is a covered area of approximately 765 square feet. In this area are two cement columns, a sculpture, several benches, and a newspaper rack. In front of the Library entrance is a parking lot that wraps

around much of the building. There are walkways between the parking lot and the Library building. The Library entrance is busy, with about 750 visits a day.

The governing body of the Library is the Library board of trustees, which is comprised of the five members of the city council. The City of Redding contracts with LSSI Corporation for management of the Library. That contract is overseen by Kimberly Niemer, the director of community services.

*September 2010 Leafleting*

Leafleting activity in September of 2010 spurred adoption of the Policy. That year, the Bostonian Tea Party (BTP), a member of the North State Tea Party Alliance, chose to celebrate Constitution Day (Sept. 17) by placing an education table outside the Library to display and disseminate various items, including pocket-sized Constitutions, its newspaper, and labels with quotations from various Founding Fathers. BTP set up its table along the west wall of the Library breezeway on September 15, 2010. Two days later, three women from the Daughters of the American Revolution (DAR) arrived and set up a card table near the east wall.

Niemer demanded that DAR move its table to the same area where BTP's table was located. Although by policy DAR did not wish to be associated with any political organization, it complied and moved its table. Suann Prigmore, the chair of BTP's Constitution Week Committee, was incensed at Niemer's demand and a dispute arose between Prigmore and Niemer.

*The Policy*

In response to this dispute, the Library board of trustees, over opposition, adopted the Policy. The Policy's stated purpose was "to recognize limited leafleting activity while exercising necessary control and supervision" on the Library campus.

As relevant to our review, the Policy provided as follows:

"**Rules for Use of Limited Public Forum Area**

"I. Repetitive distribution of written materials such as pamphlets, handbills, circulars, newspapers, magazines and other materials (Leafleting) to Library patrons may only be engaged in as follows:

"a) [limiting material to matters of public concern]

"b) if it does not involve the solicitation of funds; and

"c) if material is distributed from within the area described in the attached diagram (free speech area).

"II. No materials may be left on the windshields of automobiles parked on Library grounds.

"III. [Prohibiting use of Library's name]

"IV. The exercise of free speech and assembly rights must comply with all applicable federal, state, and local laws. In addition, such activities or any aspect of such activity, both within or outside the free speech area, shall be modified or shall cease after warning in accordance with any directive issued by Library staff, upon determination that the behavior is:

"1) [Interfering with Library programs]

"2) [Obstructing the flow of traffic]

"3) [Creating unreasonable noise]

"4) Harassing persons in the immediate area of activity. A person shall be considered to harass another if he or she:

"(a) [Strikes another]

"(b) [Attempts physical contact]

"(c) In a public place, makes an offensively coarse utterance, gesture or display, or addresses abusive language toward another person.

"(d) [Follows someone]

"(e) [Engages in annoying course of conduct with no legitimate purpose]

"5) [No violation of safety codes]

"V. Pursuant to Redding Municipal Code section 2.42.120.A.5 and 2.42.120.B,[1] any person in violation of these rules shall be in violation of the Redding Municipal Code.

---

[1] RMC section 2.42.120.A.5 provides: "It is unlawful for any person to engage in any of the following activities within or upon the premises of the Redding Municipal Library: [¶] . . . [¶] 5. Seeking or obtaining signatures on any petition, conducting surveys or investigations,

"**Procedure**

"Reservations for the limited outdoor public forum area space can be made through the on-line [*sic*] room reservation system at . . . .

"Online reservations will be taken up to six (6) months in advance and need to be made at least seventy-two (72) hours in advance. Reservations will be taken on a first-come, first-served basis. Reservations are limited to five (5) days per month in order to provide availability to others. . . ."

The diagram attached to the Policy showed that leafleting was limited to an area south of the entry doors of about 42 square feet. Tables had to be at least four feet from the doors and could cover no more than 30 square feet of the area.

Any violation of the Policy was a violation of the Redding Municipal Code (RMC); therefore, violators faced possible criminal sanctions.[2]

*Subsequent Leafleting*

In April 2011, Prigmore and other BTP members distributed leaflets in front of the Library and also put them on cars in the parking lot. In addition, members of the American Civil Liberties Union of Northern California were leafleting in front of the Library. Niemer warned them that they were in violation of the Policy. They stopped leafleting due to their concerns about being arrested.

*TRO and Preliminary Injunctions*

The American Civil Liberties Union of Northern California and two individual members (collectively, ACLU) brought a complaint against the City of Redding, the city council, and the Library director for permanent and

distributing printed materials, or soliciting within any enclosed areas, or outside of enclosed areas on the premises except in accordance with reasonable time, place and manner restrictions imposed by the library director . . . ."

RMC section 2.42.120.B provides: "It is unlawful for any person to fail to obey a directive from library personnel to cease and desist from violation of any regulation, statute, or ordinance applicable to the use of the library."

[2] RMC section 1.12.010 provides: "It is unlawful for any person to violate any provision or to fail to comply with any requirement of this code. Any person violating any of the provisions or failing to comply with any of the mandatory requirements of this code is guilty of a misdemeanor, unless the offense is specifically classified in this code or by state law as an infraction, or the city attorney reduces the charge to an infraction, in which case the person shall be guilty of an infraction. Each day that any condition caused or permitted to exist in violation of this code continues shall constitute a new and separate violation and offense."

preliminary injunctive relief and for declaratory relief. The ACLU alleged certain provisions of the Policy were unconstitutional under both the United States and California Constitutions. The complaint sought to enjoin portions of the Policy and have those portions declared unconstitutional under the federal and state Constitutions.

On the same day, Prigmore, BTP, and the North State Tea Party Alliance (collectively, Tea Party) also brought a complaint for declaratory and injunctive relief. This complaint named as defendants the City of Redding, the city council, the city manager, and the Library board of trustees. (We refer to the defendants in both cases collectively as the City.) In addition to bringing a facial and as-applied constitutional challenge to the same portions of the Policy challenged by the ACLU, the Tea Party also challenged various provisions of the RMC that were part of the Handbill Ordinance adopted in 1984.[3] The challenged provisions were (1) section 6.36.060, prohibiting placing handbills on vehicles; (2) section 6.36.080, requiring handbills to identify the person or organization who wrote the handbill and who caused the handbill to be distributed; and (3) section 6.36.100, prohibiting certain handbills that "tend to incite riot," advocate disloyalty to or overthrow of the government, or are "offensive to public morals or decency or contains blasphemous, obscene, libelous or scurrilous language."[4]

Upon ex parte applications, the court granted both the Tea Party and the ACLU temporary restraining orders (TRO), restraining enforcement of the Policy "directly or indirectly, by any means whatsoever."

After the TRO issued, leafleting resumed outside the Library. Jan Erickson, the director of Library services, gave some of those leafleting a copy of the Library's code of conduct and told them they were in violation of it. The code of conduct, which was in place before the Policy was adopted, echoed the language of RMC section 2.42.120.A.5 and prohibited leafleting "except in accordance with reasonable time, place, and manner restrictions imposed by the library staff."[5] Erickson believed, as explained to her by the city attorney, that the TRO was intended to preserve the status quo prior to adoption of the Policy and that status quo was the Library's code of conduct.

---

[3] The Handbill Ordinance, ordinance No. 1710, amended chapter 6.36 of the RMC. It was adopted "To protect the people against the nuisance of and incident to the promiscuous distribution of handbills and circulars."

[4] In addition to challenging various provisions of the Policy, the Tea Party also challenged section 2.42.120.A.5 of the RMC, which gives the Library director authority to impose reasonable time, place and manner restrictions on certain activities such as obtaining signatures on petitions, conducting surveys, leafleting, or soliciting. The City does not raise any issue with respect to this section of the RMC.

[5] Other than the Policy, there is no evidence in the record that Library staff had published any time, place and manner restrictions for leafleting.

The trial court granted the preliminary injunctions. It found the area outside the Library to be a public forum. Analyzing the challenged provisions of the Policy under intermediate or strict scrutiny, as appropriate, the court found the Tea Party and the ACLU were likely to prevail on the merits in their challenge to the Policy. It found the challenged provisions of the Handbill Ordinance/RMC were unconstitutional. Finally, the court found the loss of First Amendment freedoms constituted irreparable harm.

The preliminary injunctions enjoined enforcement of the challenged provisions of the Policy "or any other prohibition" or "requirement" relating to the same subject matter. They also enjoined any "substantively equivalent restriction" on free speech or expressive conduct in the outside areas of the Library through application of RMC section 2.42.120.A.5, or the application of any other code section, Library policy, or regulation. The preliminary injunction that had been sought only by the Tea Party also enjoined enforcement of certain provisions of the Handbill Ordinance.

## DISCUSSION

### I

### *Standard of Review*

To obtain a preliminary injunction, the plaintiff must establish the defendant should be restrained from the challenged activity pending trial. (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69 [196 Cal.Rptr. 715, 672 P.2d 121] (*IT Corp.*); *Planned Parenthood v. Wilson* (1991) 234 Cal.App.3d 1662, 1667 [286 Cal.Rptr. 427].) The plaintiff must show (1) a reasonable probability it will prevail on the merits and (2) that the harm to the plaintiff resulting from a refusal to grant the preliminary injunction outweighs the harm to the defendant from imposing the injunction.[6] (*IT Corp., supra*, 35 Cal.3d at pp. 69–70.) On appeal, a preliminary injunction will be overturned only on a showing of abuse of discretion. (*IT Corp., supra*, at pp. 69–70.)

Notwithstanding the applicability of the abuse of discretion standard of appellate review, when the trial court's order involves the interpretation and application of a constitutional provision, statute, or case law, questions of law are raised and those questions of law are subject to de novo (i.e., independent) review on appeal. (E.g., *Carpenter & Zuckerman, LLP v. Cohen* (2011) 195 Cal.App.4th 373, 378 [124 Cal.Rptr.3d 598] [order granting or denying an award of attorney fees is generally reviewed for an abuse of discretion;

---

[6] The City does not challenge the finding of irreparable harm.

however, determination of whether the criteria for an award of attorney fees have been met is a question of law that is reviewed de novo].) It is an abuse of discretion for a trial court to misinterpret or misapply the law. (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297–1298 [255 Cal.Rptr. 704].)

II

*The Outdoor Areas of the Library Campus as a Public Forum*

The City contends the trial court erred in declaring the outdoor areas of the Library to be a public forum. It adds that federal forum analysis applies to determine free speech rights under either the United States or California Constitution. Under this analysis, the Library is not like a park or streets, and is therefore not a public forum, the City argues. Rather, the City asserts, the Library is only a limited public forum.[7] "In such a forum, a government entity may impose restrictions on speech that are reasonable and viewpoint-neutral." (*Pleasant Grove City, supra*, 555 U.S. at p. 470 [172 L.Ed.2d at p. 863].)

The Tea Party and the ACLU, on the other hand, contend that California has adopted a different test for determining a public forum under the California Constitution. They assert that the California test looks to whether the proposed expressive activity is basically incompatible with the normal activities of the place in question. They contend that because leafleting outside the Library is not incompatible with the normal activities of the outdoor areas, the outdoor areas are a public forum under California's "basic incompatibility" test.

This difference of opinion as to the proper test for determining a public forum under the California Constitution arises because the provisions of the California Constitution relating to free speech differ from those of the First Amendment to the United States Constitution. We decline to apply the basic incompatibility test in this case. Nonetheless, we find the outdoor areas of the Library constitute a public forum under the federal test as applied by the California Supreme Court.

---

[7] In addition to traditional public forums and designated public forums, "a government entity may create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects." (*Pleasant Grove City v. Summum* (2009) 555 U.S. 460, 470 [172 L.Ed.2d 853, 862, 129 S.Ct. 1125] (*Pleasant Grove City*).)

## A. *First Amendment*

■ The First Amendment to the United States Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The First Amendment applies to the states by virtue of the Fourteenth Amendment. (*Grosjean v. American Press Co.* (1936) 297 U.S. 233, 244 [80 L.Ed. 660, 665, 56 S.Ct. 444].)

■ In assessing a free speech violation, the type of forum dictates the permissible restriction. In a traditional public forum, free speech rights receive the greatest degree of protection. (*Families Achieving Independence & Respect v. Nebraska Dept. of Social Services* (8th Cir. 1997) 111 F.3d 1408, 1418.) "In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' [Citation.]" (*Perry Ed. Assn. v. Perry Local Educ. Assn.* (1983) 460 U.S. 37, 45 [74 L.Ed.2d 794, 804, 103 S.Ct. 948] (*Perry*).)

In addition to streets and parks, public sidewalks are also in the category of traditional public forums. "Sidewalks, of course, are among those areas of public property that traditionally have been held open to the public for expressive activities and are clearly within those areas of public property that may be considered, generally without further inquiry, to be public forum property." (*United States v. Grace* (1983) 461 U.S. 171, 179, 180 [75 L.Ed.2d 736, 745, 746, 103 S.Ct. 1702] ["The public sidewalks forming the perimeter of the Supreme Court grounds, in our view, are public forums and should be treated as such for First Amendment purposes."].)

■ "In these quintessential public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. [Citation.] The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. [Citations.]" (*Perry, supra,* 460 U.S. at p. 45 [74 L.Ed.2d at p. 804].)

## B. *California's Liberty of Speech Clause*

Article I, section 2, subdivision (a) of the California Constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."[8]

■ This clause, known as the liberty of speech clause, "is broader and more protective than the free speech clause of the First Amendment. [Citations.]" (*Los Angeles Alliance for Survival v. City of Los Angeles* (2000) 22 Cal.4th 352, 366–367 [93 Cal.Rptr.2d 1, 993 P.2d 334] (*Los Angeles Alliance*).) For example, "the California Constitution protects the right to free speech in a shopping mall, even though the federal Constitution does not . . . ." (*Fashion Valley Mall, LLC v. National Labor Relations Bd.* (2007) 42 Cal.4th 850, 862 [69 Cal.Rptr.3d 288, 172 P.3d 742] (*Fashion Valley Mall*); see *Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 908 [153 Cal.Rptr. 854, 592 P.2d 341].) Despite this broader protection, in analyzing speech restrictions under the California Constitution, California courts employ the same time, place and manner test as the federal courts. (*Los Angeles Alliance, supra*, 22 Cal.4th at p. 364, fn. 7.)

## C. *California's Public Forum Test*

"[H]ow to articulate California's public forum test, and how that test differs from its federal counterpart, are not abundantly clear." (*Internat. Society for Krishna Consciousness of California, Inc. v. City of Los Angeles* (9th Cir. 2008) 530 F.3d 768, 775 [certifying to Cal. Supreme Court the question of whether Los Angeles International Airport (LAX) is a public forum under the liberty of speech clause of the Cal. Const.].[9])

In *Carreras v. Anaheim* (9th Cir. 1985) 768 F.2d 1039 (*Carreras*), 1045, the Ninth Circuit stated: "the test under California law is whether the communicative activity 'is basically incompatible with the normal activity of a particular place at a particular time.' [Citations.]"[10] Applying that test, the

---

[8] The Tea Party and the ACLU also rely on article I, section 3, subdivision (a) of the California Constitution, which protects the right of the people to "assemble freely to consult for the common good."

[9] The California Supreme Court declined to answer that question (and thus clarify the Cal. test). Instead, it found the ordinance at issue (prohibiting the immediate receipt of funds at LAX) was a valid time, place and manner restriction even assuming LAX was a public forum. (*International Society for Krishna Consciousness of California, Inc. v. City of Los Angeles* (2010) 48 Cal.4th 446, 455 [106 Cal.Rptr.3d 834, 227 P.3d 395] (*ISKCON*).)

[10] The Ninth Circuit quoted from *Prisoners Union v. Department of Corrections* (1982) 135 Cal.App.3d 930, 938 [185 Cal.Rptr. 634], which upheld the right of a prisoners' rights organization to distribute informational literature in a prison parking lot. The court stated,

court found the exterior walkways and parking areas of the Anaheim Stadium and the Anaheim Convention Center are public forums. (*Carreras, supra,* 768 F.2d at pp. 1045–1047.) Applying the same "basic incompatibility" test, the Ninth Circuit held the parking lot and walkways of the Cow Palace constituted a public forum. (*Kuba v. 1-A Agricultural Assn.* (9th Cir. 2004) 387 F.3d 850, 857.)

In *San Leandro Teachers Assn. v. Governing Bd. of San Leandro Unified School Dist.* (2009) 46 Cal.4th 822 [95 Cal.Rptr.3d 164, 209 P.3d 73] (*San Leandro Teachers*) the issue was whether a political organization could use internal faculty mailboxes to distribute political information. Our high court found the mailboxes were nonpublic forums under "established First Amendment public forum doctrine." (*San Leandro Teachers, supra,* 46 Cal.4th at p. 842.) The court declined to adopt the basic incompatibility test for forum analysis under the California Constitution. It acknowledged, as the Court of Appeal had, "this basic incompatibility test has not been found in California appellate cases since *U.C. Weapons Labs.* The court also pointed out that the concept of 'basic incompatibility' is used in First Amendment analysis after it has been decided that the government property in question is a public forum, to determine whether a given regulation constitutes a reasonable time, place or manner restriction. [Citation.]" (*San Leandro Teachers, supra,* at p. 845.) In any event, our high court found *U.C. Weapons Labs* distinguishable because it involved an attempt to monopolize dissemination of information about the lab and its work and there was no attempt at monopolizing information in the case before the court. (*Ibid.*)

█ Rather than applying the basic incompatibility test, our Supreme Court's approach to identifying public forums has been to analyze the similarity of the area at issue to areas that have traditionally been deemed public forums. In determining that a privately owned shopping center is a public forum, it noted the center's similarity to the streets and sidewalks of a central business district. (*Fashion Valley Mall, supra,* 42 Cal.4th at p. 858.) "To determine whether particular areas are public forums for purposes of the California Constitution's liberty of speech clause, this court has generally

---

"The question is not merely whether the parking lot is or is not a 'public forum.' Rather, the question is 'one of balancing, based on the nature of the forum, the governmental interest in enforcing the restrictions against the inhibitions the restrictions impose on the speech-related activity.' " (*Ibid.*) The court said, "the answer depends upon whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time. [Citation.]" (*Ibid.*) The "basic incompatibility" test was also used to permit an antinuclear organization to display literature and show slides in a nuclear weapons research laboratory owned by the federal government, although the court found the visitor center to be a " 'semi-public forum.' " (*U.C. Nuclear Weapons Labs Conversion Project v. Lawrence Livermore Laboratory* (1984) 154 Cal.App.3d 1157, 1168 [201 Cal.Rptr. 837] (*U.C. Weapons Labs*).) Thus, even California courts that have employed the "basic incompatibility" test have not done so for the purpose of deciding whether an area is a public forum.

proceeded by asking whether, in relevant ways, the area in question is similar or dissimilar to areas that have already been determined to be public forums. (See, e.g., *Fashion Valley Mall* . . . [stating that an area may be a public forum 'if it is open to the public in a manner similar to that of public streets and sidewalks']; *In re Hoffman* [(1967)] 67 Cal.2d 845, 851 [64 Cal.Rptr. 97, 434 P.2d 353], [comparing railway station with 'a public street or park'].)" (*ISKCON, supra,* 48 Cal.4th at 461–462 (conc. opn. of Kennard, J.).) We apply that test here.

### D. Scope of Forum

██ "To apply the public forum doctrine a court proceeds in a series of steps. In step one the court defines the 'forum' by deciding whether the forum is the entire property to which access is sought or only a portion of that property." (*Clark v. Burleigh* (1992) 4 Cal.4th 474, 484 [14 Cal.Rptr.2d 455, 841 P.2d 975] (*Clark*).) The City contends the trial court erred in defining the area at issue as only the outdoor areas rather than the entire Library campus.[11] We disagree.

In *Clark,* our Supreme Court identified the forum at issue as the candidate's statement, rather than the entire voter's pamphlet. (*Clark, supra,* 4 Cal.4th at p. 484.) Quoting *Cornelius v. NAACP Legal Defense & Ed. Fund* (1985) 473 U.S. 788, 801 [87 L.Ed.2d 567, 579, 105 S.Ct. 3439] (*Cornelius*), the court explained: " '[I]n defining the forum we have focused on the *access* sought by the speaker. When speakers seek *general* access to public property, the forum encompasses that property. [Citation.] In cases in which *limited* access is sought, our cases have taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property.' [Citation.]" (*Clark, supra,* at p. 484.)

Here, the Tea Party and the ACLU sought access only to the outdoor areas of the Library, so a "more tailored approach" is appropriate. Obviously, different considerations are present when the property in question is the inside of a building rather than open-air spaces outside. Here, the trial court did not err in defining the forum at issue as: "(1) the public open space on the entry side of the Library, (2) the entry and exit door area to the Library, and (3) the adjacent parking lot."

---

[11] Federal courts have held the interior of a library is a limited public forum. (*Faith Center Church Evangelistic Ministries v. Glover* (9th Cir. 2007) 480 F.3d 891, 908, abrogated on other grounds in *Winter v. NRDC, Inc.* (2008) 555 U.S. 7 [172 L.Ed.2d 249, 129 S.Ct. 365]; *Kreimer v. Bureau of Police* (3d Cir. 1992) 958 F.2d 1242, 1261.)

E. *Nature of Forum*

■ Next, we decide whether the area thus defined is a traditional "public forum." (*Clark, supra,* 4 Cal.4th at p. 484.) The City contends it is a *limited* public forum. The Tea Party and the ACLU take the position that it is a traditional public forum. We agree with the latter view.

In considering whether an area constitutes a traditional public forum, courts have emphasized (1) "the actual use and purposes of the property, particularly status as a public thoroughfare and availability of free public access to the area," (2) "the area's physical characteristics, including its location and the existence of clear boundaries delimiting the area," and (3) "traditional or historic use of both the property in question and other similar properties." (*ACLU of Nevada v. City of Las Vegas* (9th Cir. 2003) 333 F.3d 1092, 1100–1101; see *Albertson's, Inc. v. Young* (2003) 107 Cal.App.4th 106, 119 [131 Cal.Rptr.2d 721] (*Albertson's*) ["Whether private property is to be considered quasi-public property subject to the exercise of constitutional rights of free speech and assembly depends in part on the nature, purpose, and primary use of the property; the extent and nature of the public invitation to use the property; and the relationship between the ideas sought to be presented and the purpose of the property's occupants."].)

■ Here, the area in question is the outdoor area surrounding the Library itself, a public building. There is complete, unrestricted public access. Characterizing the area as a public forum is consistent with the role of a library as "a mighty resource in the free marketplace of ideas. [Citation.] It is specially dedicated to broad dissemination of ideas. It is a forum for silent speech. [Citation.]" (*Minarcini v. Strongsville City School Dist.* (6th Cir. 1976) 541 F.2d 577, 582–583.)

The Library is located adjacent to public parks and near other public buildings. The entrance is larger than the typical sidewalk and includes several benches and a newspaper rack. It is an area where people can rest or congregate for lengthy conversation. These physical characteristics distinguish the area at issue from, for example, stand-alone retail establishments that do not invite people to congregate, to meet friends, rest, or be entertained, and are not public forums. (See *Albertson's, supra,* 107 Cal.App.4th 106, 120; *Trader Joe's Co. v. Progressive Campaigns, Inc.* (1999) 73 Cal.App.4th 425, 433 [86 Cal.Rptr.2d 442].)

The City argues the trial court erred in ignoring precedent holding that walkways around a government building used only for ingress and egress to that building are not public forums. In *United States v. Kokinda* (1990) 497 U.S. 720, 727–728 [111 L.Ed.2d 571, 582, 110 S.Ct. 3115] (*Kokinda*), a

plurality of the Supreme Court held a sidewalk leading to and from a post office was not a public forum. The plurality distinguished the post office sidewalk from the municipal sidewalk adjacent to the street, which was a public forum, because the post office sidewalk "was constructed solely to provide for the passage of individuals engaged in postal business." (*Kokinda, supra*, 497 U.S. at p. 727 [111 L.Ed.2d at p. 582].)

*Kokinda* is not controlling here; further, it is distinguishable from the instant case. First, the portion of the plurality opinion that held the post office sidewalk was not a public forum was signed by only four members of the court. (O'Connor, J., Rehnquist, C. J., White and Scalia, JJ.) Justice Kennedy concurred in the judgment, but found it unnecessary to determine if the sidewalk was a public forum because he found the postal regulation at issue was a reasonable time, place and manner regulation. (*Kokinda, supra*, 497 U.S. at p. 739 [111 L.Ed.2d at p. 589] (conc. opn. of Kennedy, J.).) Four justices in dissent found the sidewalk was a public forum; "that the walkway at issue is a sidewalk open and accessible to the general public is alone sufficient to identify it as a public forum." (*Kokinda, supra*, at p. 745 [111 L.Ed.2d at p. 593] (dis. opn. of Brennan, J., joined by Marshall, Stevens, and Blackmun, JJ.).) Since the issue of the status of the sidewalk as a public forum was considered by an equally divided court and thus not actually decided, "under settled doctrine, the judgment of an equally divided United States Supreme Court 'is without force as precedent.' [Citation.]" (*People v. McKinnon* (1972) 7 Cal.3d 899, 911 [103 Cal.Rptr. 897, 500 P.2d 1097].)

Second, *Kokinda* appears factually distinguishable because there is no mention of a larger area in front of the post office with benches for people to congregate, read newspapers, sit and rest, and the like. Third, the rigid public forum analysis adopted by the plurality in *Kokinda* is inconsistent with our Supreme Court's interpretation of the liberty of speech clause of the California Constitution which is "broader and more protective than the free speech clause of the First Amendment. [Citations.]" (*Los Angeles Alliance, supra*, 22 Cal.4th at pp. 366–367.)

■ We conclude that leafleting on the walkways and entrance of the Library must be permitted according to the principle that "one who is rightfully on a street which the state has left open to the public carries with him there as elsewhere the constitutional right to express his views in an orderly fashion. This right extends to the communication of ideas by handbills and literature as well as by the spoken word." (*Jamison v. Texas* (1943) 318 U.S. 413, 416 [87 L.Ed. 869, 872, 63 S.Ct. 669].)

## III

### Challenged Provisions of the Policy

#### A. Intermediate Scrutiny

 "In order to qualify for intermediate scrutiny, a time, place, and manner regulation of protected speech must be content neutral, in contrast to content-based regulations, which are subjected to strict scrutiny. [Citation.] To be content neutral, a regulation must 'be "justified" by legitimate concerns that are unrelated to any "disagreement with the message" conveyed by the speech. [Citation.]' [Citations.]" (*ISKCON, supra*, 48 Cal.4th at p. 457.) The parties agree most of the challenged provisions of the Policy are content neutral;[12] therefore, intermediate scrutiny is the appropriate standard for reviewing those restrictions.

 Under intermediate scrutiny, "legislation will be upheld as a reasonable time, place, and manner regulation so long as it is (i) narrowly tailored, (ii) serves a significant government interest, and (iii) leaves open ample alternative avenues of communication. [Citation.]" (*Los Angeles Alliance, supra*, 22 Cal.4th at p. 364, fn. omitted.)

The government has the burden of justifying its restriction on speech. (*Thalheimer v. City of San Diego* (9th Cir. 2011) 645 F.3d 1109, 1116.) Even in the context of less protected commercial speech, mere speculation and conjecture will not satisfy this burden; the government must show "that the harms it recites are real." (*Edenfield v. Fane* (1993) 507 U.S. 761, 770–771 [123 L.Ed.2d 543, 555, 113 S.Ct. 1792].)

 " '[I]n determining whether a regulation is narrowly drawn, . . . we must give some deference to the means chosen by responsible decisionmakers. [Citation.]' [Citation.] To be narrowly drawn, a regulation ' "need not be the least-restrictive or least-intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' [Citations.] . . . So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the

---

[12] The Tea Party and the ACLU do not challenge section I(a) of the Policy which limits leafleting to "matter[s] of public concern (any matter of political, social or other concern to the community, or the subject of legitimate news interest)." This restriction arguably contains an unconstitutional ban on some religious speech. (See *Widmar v. Vincent* (1981) 454 U.S. 263, 277 [70 L.Ed.2d 440, 452, 102 S.Ct. 269]; *Savage v. Trammell Crow Co.* (1990) 223 Cal.App.3d 1562, 1581 [273 Cal.Rptr. 302] (*Savage*).) As it is not raised, we do not address this issue.

government's interest could be adequately served by some less-speech-restrictive alternative. 'The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests' or the degree to which those interests should be promoted. [Citations.]" [Citations.]' [Citations.]" (*ISKCON, supra,* 48 Cal.4th at p. 458.)

### B. Ban on Solicitation

Section I(b) of the Policy bans leafleting that "involve[s] the solicitation of funds." The City does not attempt to justify a complete ban on solicitation—what it refers to as "requesting future donations within the content of a leaflet." Instead, the City argues the trial court *misinterpreted* this provision, asserting that it was intended to ban only the *immediate* solicitation of funds *on site.* Erickson's declaration, submitted to the trial court, asserts the policy was intended to prohibit only the collection of money on site. As the City points out, such a ban was upheld in *ISKCON, supra,* 48 Cal.4th at page 458.[13]

Here, contrary to the City's assertion, the language of the solicitation ban is *not* narrowly tailored to serve the government's interest in banning onsite or immediate solicitations. While such a ban *may* have been the City's intent, the Policy does not accomplish that intent; the Policy simply does not say what the City now claims it meant. Rather, the Policy bans *all* leafleting involving the solicitation of funds, future as well as immediate.[14] We will not rewrite the Policy to make it constitutional. (*Aptheker v. Secretary of State* (1964) 378 U.S. 500, 515 [12 L.Ed.2d 992, 1003, 84 S.Ct. 1659].)

Because the ban on solicitation is not narrowly tailored, the trial court did not abuse its discretion in finding the Tea Party and the ACLU were likely to prevail on the merits.

### C. Restriction to Free Speech Area

Section I(c) of the Policy and its attached diagram restricts leafleting to a "free speech area" immediately to the side of the entrance doors. Within that restricted area is a smaller area designated for tables.

The City contends that similarly defined areas for free speech activities are routinely upheld applying intermediate scrutiny, citing two cases involving

---

[13] In *ISKCON*, the restriction provided: " 'No person shall solicit and receive funds inside the airport terminals . . . .' " (*ISKCON, supra,* 48 Cal.4th at p. 450, fn. 2.) In *Los Angeles Alliance, supra,* 22 Cal.4th at page 357, our high court upheld an ordinance that banned soliciting an "immediate donation" in public places if done in an aggressive manner.

[14] We note the Policy does not ban oral solicitations, which are arguably more likely to be requests for immediate donations.

state fairs, *Hynes v. Metropolitan Government of Nashville & Davidson County* (6th Cir. 1982) 667 F.2d 549 (*Hynes*), and *Heffron v. Int'l Soc. for Krishna Consc.* (1981) 452 U.S. 640 [69 L.Ed.2d 298, 101 S.Ct. 2559] (*Heffron*). We find these cases distinguishable.

First, in *Heffron*, the United States Supreme Court found the state fair to be a *limited* public forum, rather than a public forum, as we have found here. (*Heffron, supra,* 452 U.S. at p. 655 [69 L.Ed.2d at p. 311].) *Hynes* simply found *Heffron* dispositive. (*Hynes, supra,* 667 F.2d at p. 550.)

Second, the cited cases are factually distinguishable. The open walkways and entrance at issue here are not a confined space as in *Heffron*. There is no fence surrounding the area and no admission fee. (See *Bays v. City of Fairborn* (6th Cir. 2012) 668 F.3d 814, 823–825 [restricting solicitation to booths at festival not narrowly tailored]; *Saieg v. City of Dearborn* (6th Cir. 2011) 641 F.3d 727 [leafleting restriction on sidewalks outside festival was not a reasonable time, place, and manner restriction].)

Here, the City's area limitation is not narrowly tailored because it is substantially broader than necessary to achieve the City's interest. While the possibility of congestion is certainly a legitimate concern, and we acknowledge some restriction on the *tables'* placement may be appropriate, here we see no showing by the City that its restriction of those people leafleting *without* using tables, as did at least some members of the ACLU, is tailored to address the City's interest. The Policy, in provisions not challenged, prohibits obstructing the flow of pedestrian or vehicular traffic (section IV(2)) and obstructing or delaying a Library patron from ingress or egress to the Library (section I). The City has failed to show any need to further restrict the location of a single leafleteer and indeed may have exacerbated the congestion problem by restricting those leafleting to an area so near the doors.

The City contends the trial court erred in failing to consider the captive audience doctrine, which protects unwilling listeners from certain speech. We find the captive audience doctrine inapplicable.

Recently, in *Snyder v. Phelps* (2011) 562 U.S. ___ [179 L.Ed.2d 172, 131 S.Ct. 1207], the United States Supreme Court declined to apply the captive audience doctrine to a military funeral. The court explained: "As a general matter, we have applied the captive audience doctrine only sparingly to protect unwilling listeners from protected speech. For example, we have upheld a statute allowing a homeowner to restrict the delivery of offensive mail to his home, [citation], and an ordinance prohibiting picketing 'before or about' any individual's residence, [citation]." (*Id.* at pp. ___–___ [179 L.Ed.2d 172, 185–186].)

Entering the Library is not analogous to attending a funeral, and much less so to being in one's own home. As in the case of any pedestrian on any sidewalk, Library patrons can continue to enter or exit the Library to avoid unwanted leaflets. Those entering the Library "are fully capable of saying 'no' to persons seeking their attention and then walking away, they are not members of a captive audience. They have no general right to be free from being approached. [Citations.]" (*Heffron, supra,* 452 U.S. at p. 657, fn. 1 [69 L.Ed.2d at p. 313, fn. 1] (dis. opn. of Brennan, J.).)

 The City provided declarations where people professed the understandable desire to not be approached by strangers. There was a complaint that the Library "should be free of solicitation and political oppression." Such desires and complaints, while understandable, are not a legitimate basis for curtailing free speech. "Free speech inevitably encourages conflict and often rocks the boat. Phlegmatic indeed is the individual who at some time has not recoiled at the exercise of free speech by others. Annoyance and inconvenience, however, are a small price to pay for preservation of our most cherished right." (*Wirta v. Alameda-Contra Costa Transit Dist.* (1967) 68 Cal.2d 51, 62 [64 Cal.Rptr. 430, 434 P.2d 982].)

The trial court did not abuse its discretion in finding the Tea Party and the ACLU were likely to prevail on the merits in their challenge to the "free speech area" restriction.

### D. *Leafleting Windshields*

Section II of the Policy declares: "No materials may be left on the windshields of automobiles parked on Library grounds." The City justified its ban on leafleting in the parking lot primarily on safety concerns. Gary Otremba, the City's traffic operations manager, submitted a declaration stating that parking lots are designed to minimize conflicts between pedestrian traffic and circulating vehicles. He further declared, "Based on my training and experience, leafleting on windshields in parking lots will increase pedestrian versus vehicle conflict points in the parking lot due to persons moving between cars to place leaflets and persons moving about or stopping in the parking lot to remove leaflets."

There was contrary evidence before the court on the issue of safety while leafleting in the parking lot. Prigmore and another BTP member declared they had placed leaflets on the windshields of parked vehicles in April 2011 "without creating or causing a safety or security issue."

The trial court, however, did not resolve the factual issue as to whether leafleting in the parking lot was a valid safety concern. Instead, the court

identified the City's "significant governmental interest" as only "curbing litter." The court then relied upon *Klein v. City of San Clemente* (9th Cir. 2009) 584 F.3d 1196 (*Klein*), and disregarded *Savage, supra*, 223 Cal.App.3d 1562. The City contends this was error and we agree. Because the trial court failed to answer the question squarely before it—whether a concern for safety supported by an expert declaration was a sufficient governmental interest to justify the ban on leafleting in the parking lot—its ruling on this issue was arbitrary, based on the wrong law, and thus an abuse of discretion. (*People v. C.S.A.* (2010) 181 Cal.App.4th 773, 778 [104 Cal.Rptr.3d 832] ["A court abuses its discretion if it applies incorrect legal principles, as well as when its decision exceeds the bounds of reason."].)

In *Savage, supra*, 223 Cal.App.3d 1562, the Court of Appeal upheld a ban on leafleting in a shopping center parking lot. Emphasizing the deference to the means chosen by responsible decision makers, the court found the ban on leafleting was narrowly drawn because it furthered the shopping center's "interest in controlling litter and traffic." (*Savage, supra*, at p. 1574.) "Burns, the responsible decisionmaker, could reasonably conclude, as he did, that without the ban the litter and traffic burden created not just by Savage, but by the center's merchants and other political or religious groups, would make the parking lot unsightly, inconvenient and unsafe for the center's patrons. [Citation.]" (*Id.* at p. 1575.) Finally, the *Savage* court found the ban on leafleting in the parking lot "especially appropriate" because the policy did not prevent leafleting on the center's sidewalks and thus leafleteers could still reach the center's patrons. (*Ibid.*) *Savage* was cited with approval in *ISKCON, supra*, 48 Cal.4th at pp. 457–458.

Here, the trial court incorrectly declined to consider *Savage*, finding that *Savage* involved the parking lot of a shopping mall and was decided before our Supreme Court held shopping malls were public forums. But while *Savage* was decided before *Fashion Valley Mall, supra*, 42 Cal.4th 850, it was decided *after* the seminal case of *Robins v. Pruneyard Shopping Center, supra*, 23 Cal.3d at page 908, where the court held a privately owned shopping center was a public forum.

Next, the trial court found *Savage* was decided before *Klein*, a case which questioned whether litter prevention can constitute a sufficiently significant government interest to justify interference with free speech. In *Klein*, the Ninth Circuit reversed the district court's order denying a preliminary injunction enjoining enforcement of an antilittering ordinance prohibiting leafleting of unoccupied vehicles parked on city streets. (*Klein, supra*, 584 F.3d at p. 1199.) The *Klein* court rejected the city's justification of litter control because the city failed to show a nexus between leaflets placed on vehicles and a resulting substantial increase in litter. (*Klein, supra*, at p. 1202.)

In deciding *Klein*, the Ninth Circuit declined to follow *Savage* for three reasons. (*Klein, supra*, 584 F.3d at pp. 1206–1207.) First, it found *Savage* involved a private shopping mall, "making it factually and analytically distinguishable from the municipal ordinance here." (*Klein, supra*, at p. 1206.) *Savage* relied in part on the mall owner's rights to be free of business disruption and interference with customer convenience (*Savage, supra*, 223 Cal.App.3d at p. 1574), and the Ninth Circuit found that in the case before it no similar private interests were at stake. (*Klein, supra*, at p. 1206.) Second, the Ninth Circuit distinguished *Savage* because it was based on safety concerns, in addition to litter. (*Id.* at pp. 1206–1207.) Third, the Ninth Circuit found "*Savage* has been undermined, if not overruled by *Fashion Valley Mall*." (*Klein, supra*, at p. 1207.) The *Klein* court reasoned that *Savage* relied extensively on *H-CHH Associates v. Citizens for Representative Government* (1987) 193 Cal.App.3d 1193 [238 Cal.Rptr. 841] (*H-CHH*), and *H-CHH* was disapproved in *Fashion Valley Mall*. (*Klein, supra*, at p. 1207.)

None of these reasons supports following *Klein* over *Savage*. While *Savage* involved private property, the property was a public forum. Similar interests in avoiding disruption of normal activities are present in this case, as the City has an interest in precluding the disruption of the normal operations of the Library. "[T]he Government, 'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated . . . .' " (*Cornelius, supra*, 473 U.S. 788, 800 [87 L.Ed.2d 567, 576].)

Here, as in *Savage*, the ban on leafleting applied to a parking lot, not a public street, and public safety, rather than merely litter prevention, was the primary justification for the ban.[15] We disagree that *Fashion Valley Mall* has undermined *Savage* on this point. *Fashion Valley Mall* disapproved *H-CHH* to the extent it held solicitation may be prohibited simply because it competes with the merchants of the shopping center. (*Fashion Valley Mall, supra*, 42 Cal.4th at p. 869, fn. 12 [holding that a union was entitled to conduct a peaceful boycott of one of the mall's tenants].) *Savage* did not cite *H-CHH* for this point. That *Savage* remains good law on the issue of whether the ban on leafleting in the parking lot was narrowly tailored is shown by our Supreme Court's citation with approval of this portion of *Savage* in *ISKCON, supra*, 48 Cal.4th 446, 457–458.

In short, neither *Klein*, nor the City, nor the trial court offers any persuasive reason to depart from *Savage*. The trial court erred in failing to consider

---

[15] The City urges us to follow *Jobe v. City of Catlettsburg* (6th Cir. 2005) 409 F.3d 261, which upheld an ordinance prohibiting leafleting vehicles, instead of *Klein*. But the ordinance in *Jobe*, like that in *Klein*, was not justified on the basis of *safety*. In the instant case, as in *Savage*, it was.

*Savage.* More fundamentally, the trial court erred in failing to consider and address the issue before it, that is, the City's proffered justification of safety for the leafleting ban in the parking lot. Accordingly, because the trial court answered the wrong question and applied the wrong law, we conclude the trial court abused its discretion in granting the preliminary injunction as to the ban on leafleting in the parking lot. Accordingly, we shall modify both preliminary injunctions to strike paragraph (1)(c) in its entirety.

### E. *Harassment Ban*

Section IV of the Policy requires that free speech and assembly rights must comply with all laws. Further, any such activity shall cease after a warning from Library staff that the behavior falls within five categories. The fourth category prohibits "[h]arassing persons in the immediate area of activity" and then gives five examples of harassment. The Tea Party and the ACLU challenge only the third: "In a public place, makes an offensively coarse utterance, gesture or display, or addresses abusive language toward another person."

The trial court found this provision was not content neutral and therefore was subject to strict scrutiny analysis. The court found the provision unconstitutionally vague because the word "coarse" had several meanings and a violation could be criminally prosecuted. Further, the court found the provision overbroad because it prohibited constitutionally protected speech.

The City addresses only the finding of overbreadth and contends the trial court misapplied the doctrine. The City argues the Policy prohibits only the *conduct* of harassment, not speech, and it is a commonsense restriction when applied in "real world" situations. The City also dismisses the possibility of criminal sanction because "the Shasta County District Attorney has more important things on his plate."

The City's arguments fail. "It is settled law that a state may not directly prohibit offensive speech. [Citations.]" (*Rosen v. Port of Portland* (9th Cir. 1981) 641 F.2d 1243, 1249, fn. 10.) "[E]ven a clear and narrowly drawn restriction of many forms of behavior offensive to most people may be hard to reconcile with the values enshrined in the First Amendment. [Citation.]" (*Gatto v. County of Sonoma* (2002) 98 Cal.App.4th 744, 776 [120 Cal.Rptr.2d 550].) The Policy bans speech that the Library staff deems "offensively coarse" and such a ban is unconstitutional.

In *Cohen v. California* (1971) 403 U.S. 15 [29 L.Ed.2d 284, 91 S.Ct. 1780] (*Cohen*), the United States Supreme Court held that wearing a jacket bearing the words "Fuck the Draft" in the corridor of a courthouse, while clearly

offensive to many people, was protected by the First Amendment. The court explained: "How is one to distinguish this from any other offensive word? Surely the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us. Yet no readily ascertainable general principle exists for stopping short of that result were we to affirm the judgment below." (*Cohen, supra,* 403 U.S. at p. 25 [29 L.Ed.2d at p. 294].)

The trial court did not abuse its discretion in granting a preliminary injunction enjoining enforcement of section IV(4) of the Policy.

F. *Reservation System*

The Policy provides that reservations for use of the "free speech area" must be made at least 72 hours and up to six months in advance and are limited to five days a month. The City contends advance reservations for designated space for free speech activities are "routinely" upheld. The City is incorrect on this point.

Advance notice requirements and permitting schemes that apply to individuals and small groups routinely run afoul of the First Amendment as most are overbroad and not narrowly tailored. (See *Boardley v. U.S. DOI* (D.C. Cir. 2010) 392 U.S. App.D.C. 255 [615 F.3d 508, 520–521] and cases cited.) A permitting requirement, even where ministerial and performed promptly at no cost, raises significant concerns, particularly the loss of anonymity and the ban on spontaneous speech. (*Watchtower Bible & Tract Soc. of N. Y., Inc. v. Village of Stratton* (2002) 536 U.S. 150, 166–168 [153 L.Ed.2d 205, 219–221, 122 S.Ct. 2080] [holding ordinance that required individuals to obtain a permit prior to engaging in door-to-door advocacy and to display the permit upon demand violated the 1st Amend.].)

Further, since we have concluded that the trial court properly granted the preliminary injunction as to enforcement of the "free speech area," we apply that conclusion to the reservation system as well. Without a limited free speech area, the City has shown no need for the reservation system, particularly one such as this, which applies not merely to groups of a designated number but also to any individual wishing to share his or her viewpoint with others.

IV

*The Tea Party's Challenge to the Handbill Ordinance*

The Tea Party challenged the portions of the Handbill Ordinance that prohibited placing handbills on vehicles, required the identification of the

author, and banned handbills that encouraged a breach of the peace or which were "offensive to public morals or decency or contains blasphemous, obscene, libelous or scurrilous language." The trial court granted a preliminary injunction to enjoin enforcement of these provisions.

### A. *Standing*

The City first contends the Tea Party lacks standing to challenge these provisions of the RMC because these provisions were neither enforced against the Tea Party nor was there any credible threat of enforcement. The City provided the declaration of the chief of police, who stated there had been only one citation under these provisions since 1989. In 1990, there was a citation for violation of RMC section 6.36.060, the prohibition on leafleting vehicles. Again, the City's argument fails to persuade.

■■■ "A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." (*Babbitt v. Farm Workers* (1979) 442 U.S. 289, 298 [60 L.Ed.2d 895, 906, 99 S.Ct. 2301] (*Babbitt.*) "It is sufficient for standing purposes that the plaintiff intends to engage in 'a course of conduct arguably affected with a constitutional interest' and that there is a credible threat that the challenged provision will be invoked against the plaintiff. [Citation.] By contrast, 'persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs.' [Citation.]" (*LSO, Ltd. v. Stroh* (9th Cir. 2000) 205 F.3d 1146, 1154–1155.) Under California law, it is sufficient that the objecting party show actual or threatened injury from the enactment of a statute or regulatory measure. (*B. C. Cotton, Inc. v. Voss* (1995) 33 Cal.App.4th 929, 948 [39 Cal.Rptr.2d 484].)

■■■ In the First Amendment context, the United States Supreme Court has relaxed the general rule of standing to allow even a challenge to the constitutionality of an ordinance affecting even those *other than* the challenger. "This exception from traditional rules of standing to raise constitutional issues has reflected the Court's judgment that the very existence of some statutes may cause persons not before the Court to refrain from engaging in constitutionally protected speech or expression." (*Young v. American Mini Theatres* (1976) 427 U.S. 50, 59–60 [49 L.Ed.2d 310, 96 S.Ct. 2440].) Standing rules are relaxed in the free speech context because "when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged." (*Secretary of State of Md. v. J. H. Munson Co.* (1984) 467 U.S. 947, 956 [81 L.Ed.2d 786, 795, 104 S.Ct. 2839].)

Here, we conclude the Tea Party faced a "realistic danger" or "credible threat" of prosecution under the Handbill Ordinance. Although the Handbill Ordinance had not been enforced for many years, the City has not declared its intent to abandon the ordinance. (See *Babbitt, supra,* 442 U.S. at p. 302 [60 L.Ed.2d at p. 909].) More significantly, when faced with a temporary restraining order preventing enforcement of the Policy, the City sought other means to interfere with leafleting outside the Library. The director of Library services informed those persons who were leafleting that they were in violation of the Library's code of conduct, even though no time, place and manner restrictions had been promulgated under this code other than the Policy. "Further, the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." (*Virginia v. American Booksellers Assn.* (1988) 484 U.S. 383, 393 [98 L.Ed. 2d 782, 794, 108 S.Ct. 636].) We hold the Tea Party had standing to challenge provisions of the Handbill Ordinance.

### B. *Constitutionality*

The City makes no attempt to show the challenged provisions of the Handbill Ordinance are constitutional, limiting its argument to the standing issue. Even a cursory review of the challenged provisions indicates the Tea Party is likely to prevail on the merits in its challenge.

■ RMC section 6.36.060 prohibits placing handbills on any vehicle in the City. The sole justification for this ban is littering. This distinguishes the citywide ban from the ban on leafleting in the parking lot discussed *ante*. In *Van Nuys Pub. Co. v. City of Thousand Oaks* (1971) 5 Cal.3d 817, 827–828 [97 Cal.Rptr. 777, 489 P.2d 809], our Supreme Court struck down as overbroad an antilittering ordinance that prohibited distributing any printed material upon public or private property without consent of the recipient. The instant prohibition compares, and is similarly overbroad.

■ RMC section 6.36.080 requires a handbill to contain the identity of the person or organization who printed or wrote the handbill and who caused the handbill to be distributed. "There can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression. 'Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value.' [Citation.]" (*Talley v. California* (1960) 362 U.S. 60, 64 [4 L.Ed.2d 559, 563, 80 S.Ct. 536] [invalidating ordinance prohibiting all anonymous leafleting].)

RMC section 6.36.100 prohibits illegal handbills, including those that are "offensive to public morals or decency or contain[] blasphemous, obscene,

libelous or scurrilous language." This provision compares to that contained in section IV(4) of the Policy, discussed at length *ante*, and is similarly constitutionally infirm.

The trial court did not err in granting the Tea Party a preliminary injunction to enjoin enforcement of these provisions of the Handbill Ordinance.

## V

### *Breadth of Preliminary Injunctions*

 Finally, the City contends the preliminary injunctions are overly broad, going beyond the scope of the trial court's ruling. "A preliminary injunction is an interim remedy designed to maintain the status quo pending a decision on the merits. [Citation.]" (*MaJor v. Miraverde Homeowners Assn.* (1992) 7 Cal.App.4th 618, 623 [9 Cal.Rptr.2d 237].) The City contends the preliminary injunctions restrain the City more than necessary to maintain the status quo. We agree that certain language in the preliminary injunctions is too broad and shall order that language stricken.

The City objects that the preliminary injunctions prohibit not only certain acts under the Policy, but also acts that fall outside the Policy. We recognize that the trial court was attempting to restrain the City from enforcing those provisions of the Policy *by other means* and that it considered this broad approach necessitated by the City's additional attempt to enforce the Policy (citing the Library's Code of Conduct) *after* the temporary restraining orders issued. Unfortunately, in some instances, the trial court's language was broader than it needed to be to effectuate the legitimate purpose of discouraging the City from again attempting to circumvent the enjoining orders.

We review only those portions of the preliminary injunctions *specifically* raised by the City.[16] The City claims three portions of the Tea Party preliminary injunction are too broad. These sections enjoin enforcement of various provisions of the Policy. Paragraph 1(a) of the Tea Party preliminary injunction reads: "Section I(b) of the Policy, *or any other prohibition against oral or written solicitation of funds on or about the RML campus.*" We agree the italicized portion is overbroad; it prohibits the City, for example, from adopting a ban on aggressive, immediate solicitation—a ban that would be permissible under *ISKCON, supra,* 48 Cal.4th at page 458 and *Los Angles Alliance, supra,* 22 Cal.4th at page 357. We shall order the italicized language stricken.

---

[16] It is unclear if the City intended its argument on this point to be exhaustive or merely illustrative. It begins its discussion of the offending sections of the preliminary injunctions with "For example."

Paragraph 1(d) of the Tea Party preliminary injunction reads: "Section IV-4-(c) of the Policy, *or any other prohibition against offensively coarse utterances, gestures, displays, or abusive language to any person present.*" Since this language is not limited to conduct occurring during leafleting, the issue before the trial court, it is overbroad in the context of this case. (See *Marquez-Luque v. Marquez* (1987) 192 Cal.App.3d 1513, 1517–1518 [238 Cal.Rptr. 172] [reversing harassment order that included a provision evicting the defendant from his residence because eviction was beyond the scope of the harassment proceeding].) We shall order the italicized language stricken.

Paragraph 1(e) of the Tea Party preliminary injunction reads: "The 'Procedure' section of the Policy, *or any other requirement that requires an individual desiring to engage in free speech or expressive conduct on or about the RML campus to make an advance reservation, or that otherwise impedes or restricts anonymous free speech and expressive conduct.*" Again, this provision goes beyond the dispute at issue since it applies to more than conduct occurring during leafleting. In addition, the final clause, enjoining any requirement "that otherwise impedes or restricts anonymous free speech and expressive conduct" is vague. We again order the italicized language stricken.

The City challenges only one portion of the ACLU preliminary injunction. Paragraph 1(a) of that preliminary injunction reads: "Section I(b) of the Policy, *or any other prohibition against oral or written solicitation of funds for charitable purposes while leafleting.*" As with the Tea Party preliminary injunction, this provision would prohibit the City from adopting a ban on aggressive, immediate solicitation that is permissible under *ISKCON, supra*, 48 Cal.4th at page 458 and *Los Angles Alliance, supra*, 22 Cal.4th at page 357. The italicized language must be stricken.

## DISPOSITION

The Tea Party preliminary injunction is modified by striking the following:

(1) In paragraph 1. (a), the language "or any other prohibition against oral or written solicitation of funds on or about the RML campus."

(2) Paragraph 1. (c) in its entirety.

(3) In paragraph 1. (d), the language "or any other prohibition against offensively coarse utterances, gestures, displays, or abusive language to any person present."

(4) In paragraph 1. (e), the language "or any other requirement that requires an individual desiring to engage in free speech or expressive conduct

on or about the RML campus to make an advance reservation, or that otherwise impedes or restricts anonymous free speech and expressive conduct."

The ACLU preliminary injunction is modified by striking the following:

(1) In paragraph 1(a), the language "or any other prohibition against oral or written solicitation of funds for charitable purposes while leafleting."

(2) Paragraph 1(c) in its entirety.

As modified, the trial court's orders granting preliminary injunctions are affirmed. The Tea Party and the ACLU shall recover costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

Raye, P. J., and Hull, J., concurred.