Filed 11/14/25 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| TULARE LAKE BASIN WATER STORAGE DISTRICT et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> DEPARTMENT OF WATER RESOURCES, <br><br> Defendant and Appellant. | C101878 <br><br> (Super. Ct. Nos. 24WM000006, 24WM000008, 24WM000009, 24WM000010, 24WM000011, 24WM000012, 24WM000014, 24WM000017, 24WM000062, 24WM000076) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING <br><br> [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed in this case on October 17, 2025, be modified as follows:

On page 3, first full paragraph, delete "preconstruction" from the second sentence so that the sentence now reads:

Various municipal, tribal, and public interest entities -- plaintiffs in underlying actions -- assert that DWR cannot engage in geotechnical work until it submits certification that the

1

tunnel project is consistent with the Delta Plan, California's management plan for the Delta.

On page 3, first full paragraph, delete "preconstruction" from the fourth sentence so that the sentence now reads:

The trial court agreed with plaintiffs, issuing preliminary injunctions preventing DWR from engaging in geotechnical work before it submits a certification of consistency.

On page 3, second full paragraph, after the last sentence ending with "but the preconstruction geotechnical work is not" insert the following footnote as footnote 2 (adjusting the numerical sequence of the succeeding footnotes throughout):

Counsel for plaintiffs said so during oral argument. In a petition for rehearing, plaintiffs claim the issue in this appeal is not limited to "preconstruction" geotechnical work. But DWR agreed it must obtain a certification of consistency before it commences construction.

On page 5, first full paragraph of the Background, last sentence, delete "challenged" so that the sentence now reads:

Finally, the background describes the Delta tunnel project, focusing on the preconstruction geotechnical work, and then provides the relevant procedural background.

On page 12, first full paragraph, delete "preconstruction" throughout the paragraph so that the paragraph now reads:

In December 2023, DWR certified the project's final EIR and approved the project. Although the final EIR's Executive Summary section described the project as "consist[ing] of the construction, operation, and maintenance" of the above-described "water diversion and conveyance facilities," the Project Description section included additional geotechnical work that was similar in nature to the initial geotechnical work

covered by the IS/MND and subsequent addenda.  The geotechnical work set forth in the final EIR included the following:

On page 13, last paragraph, delete the first sentence beginning with "As mentioned" and replace with the following:

As mentioned, the geotechnical work relevant to this appeal would be carried out prior to construction of the project.

On page 14, second full paragraph under subsection D, fifth sentence, delete "the preconstruction" so that the sentence now reads:

They also filed a motion for preliminary injunction, seeking to enjoin DWR from proceeding with geotechnical work "unless and until it complies with the mandates of the Delta Reform Act."

On page 15, first full sentence, delete "preconstruction" throughout the sentence, so that the sentence now reads:

They argued they were likely to prevail on their Delta Reform Act claim because (1) "it is undisputed that the [tunnel project] is a 'covered action' " within the meaning of the Delta Reform Act, (2) the geotechnical work is "an inextricable part of the [tunnel project]" and thus part of the covered action, (3) engaging in such work amounts to " 'initiating the implementation of that covered action' " within the meaning of section 85225, and therefore, (4) DWR was required to certify consistency with the Delta Plan prior to engaging in geotechnical work.

On page 17, second full paragraph, last sentence, delete "preconstruction" so that the sentence now reads:

Plaintiffs also argued that DWR was asking the trial court to usurp the Council's statutory authority to determine for itself, in an appeal from a certification of consistency, whether the geotechnical work was covered by and consistent with the Delta Plan.

On page 17, last full paragraph, delete "preconstruction" so that the paragraph now reads:

The trial court denied the ex parte application, concluding the scaled-down geotechnical work was still part of the covered action under section 85225, and DWR must still complete the certification process prior to engaging in geotechnical work.

On page 18, first full paragraph, delete the second sentence and replace with the following sentence:

Certain plaintiffs appealed to the Council.

This modification does not change the judgment.

The petition for rehearing is denied.

FOR THE COURT:


_____/S/_____
MAURO, Acting P. J.


_____/S/_____
KRAUSE, J.


_____/S/_____
WISEMAN, J.*

_____

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 10/17/25

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| TULARE LAKE BASIN WATER STORAGE DISTRICT et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> DEPARTMENT OF WATER RESOURCES, <br><br> Defendant and Appellant. | C101878 <br><br> (Super. Ct. Nos. 24WM000006, 24WM000008, 24WM000009, 24WM000010, 24WM000011, 24WM000012, 24WM000014, 24WM000017, 24WM000062, 24WM000076) |

APPEAL from a judgment of the Superior Court of Sacramento County, Stephen P. Acquisto, Judge. Reversed with directions.

Rob Bonta, Attorney General, Tracy L. Winsor, Senior Assistant Attorney General, Evan Eickmeyer, Acting Senior Assistant Attorney General, Sierra Arballo, Lindsay DeRight, Tiffany Yee, Colin Smithey, Kristin McCarthy, L. Elizabeth Sarine, Stephen A. Sunseri, and David M. Meeker, Deputy Attorneys General, for Defendant and Appellant.

Lisa A. Travis, County Counsel, William C. Burke and Diane E. McElhern, Deputy County Counsel; Somach Simmons & Dunn and Kelley M. Taber for Plaintiffs and Respondents County of Sacramento, Sacramento County Water Agency and Sacramento Area Sewer District.

Lori Asuncion, City Attorney; Somach Simmons & Dunn and Kelley M. Taber for Plaintiff and Respondent City of Stockton.

Aqua Terra Aeris Law Group, Jason R. Flanders, Erica A. Maharg, Harrison M. Beck; San Francisco Baykeeper, Eric J. Buescher and M. Ben Eichenberg for Plaintiffs and Respondents San Francisco Baykeeper, Shingle Springs Band of Miwok Indians,

1

California Indian Environmental Alliance, Restore the Delta, Golden State Salmon Association, and The Bay Institute.

Freeman Firm, Thomas H. Keeling; Law office of Roger B. Moore and Roger B. Moore for Plaintiffs and Respondents County of San Joaquin, County of Contra Costa, Contra Costa County Water Agency, County of Solano, County of Yolo, Central Delta Water Agency.

Soluri Meserve, Osha R. Meserve and Patrick M. Soluri for Plaintiffs and Respondents County of San Joaquin, County of Contra Costa, Contra Costa County Water Agency, County of Solano, County of Yolo, Central Delta Water Agency, and Local Agencies of the North Delta.

Edward James Kiernan, County Counsel, and Kirnpreet Kaur Virk, Deputy County Counsel, for Plaintiff and Respondent County of San Joaquin.

Thomas L. Geiger, County Counsel, and Stephen M. Siptroth, Assistant County Counsel, for Plaintiffs and Respondents County of Contra Costa and Contra Costa County Water Agency.

Bernadette Curry, County Counsel, and Holly E. Tokar, Deputy County Counsel, for Plaintiff and Respondent County of Solano.

Philip J. Pogledich, County Counsel, and Eric May, Senior Deputy County Counsel, for Plaintiff and Respondent County of Yolo.

Nomellini, Grilli & McDaniel Law Office, Dante John Nomellini and Dante John Nomellini, Jr., for Plaintiff and Respondent Central Delta Water Agency.

No appearance for Plaintiffs and Respondents Tulare Lake Basin Water Storage District, Sierra Club, Center for Biological Diversity, Friends of the River, California Water Impact Network, Planning and Conservation League, AquAlliance, Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, California Sportfishing Protection Alliance, North Coast Rivers Alliance, Friends of Stone Lakes National Wildlife Refuge, Save Our Sandhill Cranes, Environmental Council of Sacramento, Sacramento Audubon Society, North Delta Water Agency, South Delta Water Agency, Rudy Mussi Investment L.P., and County of Butte.

Shute, Mihaly & Weinberger, Ellen J. Garber and Gabriel B. Ross for Delta Stewardship Council as Amicus Curiae.

The California Department of Water Resources (DWR) seeks to commence preconstruction geotechnical work, such as soil and groundwater testing, in the Sacramento-San Joaquin Delta and Suisun Marsh (the Delta) in anticipation of implementing the Delta tunnel project, an endeavor that proposes to construct a water tunnel under the Delta to improve water conveyance and environmental protection. Various municipal, tribal, and public interest entities -- plaintiffs in underlying actions -- assert that DWR cannot engage in preconstruction geotechnical work until it submits certification that the tunnel project is consistent with the Delta Plan, California's management plan for the Delta. Plaintiffs argue the certification is mandated by the Sacramento-San Joaquin Delta Reform Act of 2009 (Wat. Code, § 85000 et seq.)[1] (the Delta Reform Act). The trial court agreed with plaintiffs, issuing preliminary injunctions preventing DWR from engaging in preconstruction geotechnical work before it submits a certification of consistency. In this appeal brought by DWR, we interpret the Delta Reform Act differently than the trial court and reach a different conclusion.

Section 85225 of the Delta Reform Act provides that before implementing a "covered action," a state agency must submit to the Delta Stewardship Council (the Council) a certification that the covered action is consistent with the Delta Plan. Section 85057.5 states that a covered action under the Delta Reform Act is one that, among other things, is covered by the Delta Plan and will have a significant impact on achievement of a coequal goal of Delta management. The parties agree that under the relevant statutory scheme, the tunnel project is a covered action, but the preconstruction geotechnical work is not.

---

[1] Undesignated statutory references are to the Water Code.

3

Nevertheless, plaintiffs contend that DWR's attempt to separate the geotechnical work from the rest of the tunnel project is the type of "piecemealing" barred by the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA), a prohibition they say is incorporated into the Delta Reform Act because section 85057.5 expressly references the CEQA definition of a "project," and the body of CEQA law refers to a CEQA project as the whole of an action.  They add that DWR included the geotechnical work in its project description for the Environmental Impact Report (EIR), and plaintiffs cannot file a challenge to the geotechnical work with the Council until DWR submits a certification of consistency.  The trial court agreed with these arguments, concluding that plaintiffs had a reasonable probability of prevailing on the merits based on the trial court's interpretation of the statutory provisions.

We disagree that the CEQA whole-of-an-action requirement and prohibition against piecemealing is incorporated into the Delta Reform Act's certification of consistency requirement.  As we will explain, the purposes of the two statutory schemes are different; the preconstruction geotechnical work does not fall within the requirements of section 85057.5; there is insufficient indication that the Legislature intended to incorporate the CEQA whole-of-an-action requirement and prohibition against piecemealing into the Delta Reform Act consistency certification requirement; and guidance from the Council supports our interpretation.

The Delta Reform Act does not require DWR to submit a certification of consistency before engaging in preconstruction geotechnical work.  Thus, plaintiffs have not demonstrated a reasonable probability of prevailing on the merits.  And because the procedural posture of the case has changed, the trial court should reassess and rebalance the probability of prevailing against any showing of harm presented by plaintiffs on remand.

We will reverse the June 20, 2024 orders granting plaintiffs' motions for preliminary injunction, and remand the matters to the trial court with directions to vacate

4

those orders and reconsider plaintiffs' motions in light of this court's conclusion that a certification of consistency is not required before DWR engages in preconstruction geotechnical work.

BACKGROUND

Our recitation of the background begins with an overview of the Delta, emphasizing its importance to California's water delivery system and the ecological problems that led to enactment of the Delta Reform Act. We then provide an overview of the Delta Reform Act to place the present dispute in its legal context. Finally, the background describes the Delta tunnel project, focusing on the challenged preconstruction geotechnical work, and then provides the relevant procedural background.[2]

---

[2] DWR asks this court to take judicial notice of various documents. With one exception, each of the documents is either a court record or an official act of an executive department. (Evid. Code, § 452, subds. (c) & (d).) They are also relevant to DWR's arguments on appeal. We therefore grant DWR's request with respect to exhibits A through D and F through K. Although the documents evidence events occurring after the ruling challenged on appeal, " '[s]ince relief by injunction operates in futuro, the right to such relief must be determined . . . at the time of an appellate court's decision.' [Citation.]" (*Broadmoor San Clemente Homeowners Assn. v. Nelson* (1994) 25 Cal.App.4th 1, 4; see also *Tulare Irrigation Dist. v. Lindsay-Strathmore Irrigation Dist.* (1935) 3 Cal.2d 489, 527.) DWR's request is denied with respect to exhibit E, which is not an official act of an executive department, but rather an internal memorandum. Of course, even if we were to judicially notice the document, we would not judicially notice the truth of its contents (see *People v. Sledge* (2017) 7 Cal.App.5th 1089, 1096 [judicial notice establishes existence and content of document, not the truth of any factual statements contained therein]), an observation applicable to all the documents we judicially notice. Hence, we deny DWR's request for judicial notice of certain facts it claims are established by the documents. To the extent the purported facts are supported by the documents and are relevant to our analysis of the issues presented, we will reference them in this opinion. We need not take judicial notice of them.

Plaintiffs ask us to take judicial notice of two court records, a ruling on a subsequent request for a stay of the challenged preliminary injunction (exhibit 1) and an unrelated ruling in a different case (exhibit 2). Both are judicially noticeable as court records

5

A

The Delta "is an expansive inland river delta and estuary in Northern California" located at the confluence of the Sacramento and San Joaquin rivers. As this court recently explained, the Delta "is the most valuable estuary and wetland ecosystem on the west coast of North and South America, and is the hub of California's water delivery system. (§ 85002.) It is endowed with many invaluable and unique resources of major statewide significance, including highly productive agriculture, recreational assets, fisheries, and wildlife environment. (§ 12981, subds. (a), (b).) In addition, the economies of major regions of the state depend on the ability to use water within the Delta watershed or to import water from the Delta watershed. More than two-thirds of California residents and more than two million acres of highly productive farmland receive water exported from the Delta watershed. (§ 85004, subd. (a).)" (*Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1027 (*Delta Stewardship*).)

As noted in DWR's final EIR for the tunnel project, the Delta watershed is "at the core of California's [State Water Project] and [Central Valley Project] water systems, which convey water to millions of Californians."[3] "Although [those water delivery

(Evid. Code, § 452, subd. (d)), but only one is relevant. We grant the request with respect to exhibit 1, as that ruling is relevant to the parties' arguments on appeal. The request is denied with respect to exhibit 2 because the unrelated ruling is irrelevant to our resolution of this appeal. (See *National Asian American Coalition v. Newsom* (2019) 33 Cal.App.5th 993, 1002, fn. 7.) We also grant DWR's separate and related request for judicial notice of the transcript of the hearing on the stay request (exhibit L). In addition, plaintiffs ask us to take judicial notice of certain parts of the Delta Plan. We grant that request as well. (Evid. Code, § 452, subds. (c).)

[3] "The State Water Project is one of 'two great water projects aimed at addressing the state's "fundamental water problem." ' [Citation.]" (*Planning & Conservation League v. Department of Water Resources* (2024) 98 Cal.App.5th 726, 741.) Operated under DWR's management, it consists of a series of dams and reservoirs, power plants, and pumping plants stretching from Butte County in the north to Riverside County in the south. (*Ibid.*) "The other project is the Central Valley Project, which is operated by the

6

systems] were originally engineered to reliably deliver water to water service contractors and water rights holders without commensurate consideration for impacts on native species, the projects are currently operated in a coordinated fashion to optimize system efficiencies and to comply with state and federal regulatory restrictions that are intended to protect water quality and sensitive environmental resources through careful orchestration of reservoir releases upstream of the Delta and pumping from south of the Delta." (*Delta Stewardship, supra*, 48 Cal.App.5th at pp. 1033-1034.)

Nevertheless, such heavy reliance on water from the Delta watershed has created "substantial water supply and ecosystem conflicts." (*Delta Stewardship, supra*, 48 Cal.App.5th at p. 1034.) In *Delta Stewardship*, this court described the problems caused by an inability "to find balance in the tradeoffs among competing demands" for Delta water. (*Id*. at p. 1035.) For present purposes, we highlight that "[t]he Delta is currently . . . not meeting the demands of farmers and urban water users who want assurances of supply and, in some cases, more water. Nor is the Delta adequately serving the needs of fish and wildlife—some threatened or endangered species' numbers remain perilously low. And the Delta itself remains inherently flood-prone. [¶] . . . [¶] . . . Delta residents and farmers face the possibility of floods from the east when the rivers flow strongly and of salinity intrusion from the west if they flow too feebly. Fishermen, both commercial and recreational, are worried about the future of salmon and other species. Water suppliers that export water from the Delta find those supplies insecure, subject to interruption by weather vagaries, levee failures, or pumping restrictions imposed in the desperate attempt to stem the decline of fish." (*Id*. at pp. 1034-1035.)

---

United States Bureau of Reclamation . . . . This project provides water storage and distribution to California's Central Valley primarily for agricultural use." (*Ibid*., fn. 2.)

7

B

The Legislature enacted the Delta Reform Act in 2009 (*Delta Stewardship, supra*, 48 Cal.App.5th at p. 1038), declaring that the Delta "watershed and California's water infrastructure are in crisis and existing Delta policies are not sustainable. Resolving the crisis requires fundamental reorganization of the state's management of Delta watershed resources." (§ 85001, subd. (a).) The stated purpose of the Delta Reform Act is "to provide for a more reliable water supply for the state, to protect and enhance the quality of water supply from the Delta, and to establish a governance structure that will direct efforts across state agencies to develop a legally enforceable Delta Plan." (§ 85001, subd. (c).)

"[T]he Legislature created the Council as an independent agency of the state . . . and charged it with adopting and implementing [the Delta Plan,] a comprehensive, long-term management plan for the Delta that is built upon the principles of adaptive management and uses the best available science to further two coequal goals—'providing a more reliable water supply for California and protecting, restoring, and enhancing the Delta ecosystem.' (§ 85054; see §§ 85300, subd. (a), 85302, subds. (a), (g), 85308, subds. (a), (f), 85059.)" (*Delta Stewardship, supra*, 48 Cal.App.5th at p. 1038, fns. omitted; see also § 85200, subd. (a).) The Legislature "directed the Council to achieve the coequal goals 'in a manner that protects and enhances the unique cultural, recreational, natural resource, and agricultural values of the Delta as an evolving place.' (§ 85054.)" (*Delta Stewardship,* at p. 1038.) The Legislature further declared that the following objectives "are inherent in the coequal goals for management of the Delta:" (1) "Manage the Delta's water and environmental resources and the water resources of the state over the long term"; (2) "Protect and enhance the unique cultural, recreational, and agricultural values of the California Delta as an evolving place"; (3) "Restore the Delta ecosystem, including its fisheries and wildlife, as the heart of a healthy estuary and wetland ecosystem"; (4) "Promote

8

statewide water conservation, water use efficiency, and sustainable water use"; (5) "Improve water quality to protect human health and the environment consistent with achieving water quality objectives in the Delta"; (6) "Improve the water conveyance system and expand statewide water storage"; (7) "Reduce risks to people, property, and state interests in the Delta by effective emergency preparedness, appropriate land uses, and investments in flood protection"; and (8) "Establish a new governance structure with the authority, responsibility, accountability, scientific support, and adequate and secure funding to achieve these objectives." (§ 85020, subds. (a)-(h).)

The Delta Reform Act requires "that state and local land use actions identified as 'covered actions' . . . be consistent with the Delta Plan." (§ 85022, subd. (a).) As relevant here, the phrase "covered action" means "a plan, program, or project" as defined by section 21065 of the Public Resources Code that (1) will occur, in whole or in part, within the boundaries of the Delta or Suisun Marsh, (2) will be carried out, approved, or funded by the state or a local public agency, (3) is covered by one or more provisions of the Delta Plan, and (4) will have a significant impact on achievement of one or both of the coequal goals. (§ 85057.5, subd. (a).)

Public Resources Code section 21065, referenced in section 85057.5's definition of a "covered action," provides in relevant part that a CEQA project "means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is," as relevant here, "undertaken by any public agency." (Pub. Resources Code, § 21065, subd. (a).)

In addition, section 85225 provides: "A state or local public agency that proposes to undertake a covered action, prior to initiating the implementation of that covered action, shall prepare a written certification of consistency with detailed findings as to whether the covered action is consistent with the Delta Plan and shall submit that certification to the [C]ouncil."

9

Challenges to certifications of consistency are brought to the Council by way of appeal: "Any person who claims that a proposed covered action is inconsistent with the Delta Plan and, as a result of that inconsistency, the action will have a significant adverse impact on the achievement of one or both of the coequal goals . . . may file an appeal with regard to a certification of consistency submitted to the [C]ouncil." (§ 85225.10, subd. (a).) If no appeal is filed, the state or local public agency may proceed to implement the covered action. (§ 85225.15.) If an appeal is filed, the Council must hold a hearing, unless it is determined that the issue raised on appeal is not within the Council's jurisdiction or does not raise an appealable issue. (§ 85225.20.) "After a hearing on an appealed action, the [C]ouncil shall make specific written findings either denying the appeal or remanding the matter to the state or local public agency for reconsideration of the covered action based on the finding that the certification of consistency is not supported by substantial evidence in the record before the state or local public agency that filed the certification. Upon remand, the state or local agency may determine whether to proceed with the covered action. If the agency decides to proceed with the action or with the action as modified to respond to the findings of the [C]ouncil, the agency shall, prior to proceeding with the action, file a revised certification of consistency that addresses each of the findings made by the [C]ouncil and file that revised certification with the [C]ouncil." (§ 85225.25; see *Delta Stewardship, supra*, 48 Cal.App.5th at pp. 1044-1045.)

Adopted by the Council in 2013, "[t]he Delta Plan, which spans nearly 300 pages, provides a detailed history, description, and analysis of the various problems and challenges facing the Delta." (*Delta Stewardship, supra*, 48 Cal.App.5th at p. 1042.) "The working parts of the Delta Plan are 73 recommendations and 14 policies. The recommendations are nonregulatory but call out actions essential to achieving the coequal goals of the Delta Reform Act . . . . By contrast, the policies are regulatory in nature; state and local agencies proposing to undertake a 'covered action' . . . must comply with

the policies. (See §§ 85022, subd. (a), 85057.5, subd. (a).) The regulatory policies are enforced by the Council's appellate authority and oversight over covered actions. As explained by the Delta Plan, 'In contrast to how many other governmental plans are implemented, the Council does not exercise direct review and approval authority over covered actions to determine their consistency with the regulatory policies in the Delta Plan. Instead, State or local agencies self-certify Delta Plan consistency, and the Council serves as an appellate body for those determinations.' If the covered action is found to be inconsistent, the project may not proceed until it is revised so that it is consistent with the Delta Plan." (*Id*. at p. 1042, fn. & italics omitted.)

C

The Delta tunnel project, formally titled the Delta Conveyance Project, in very general terms "consists of the construction, operation, and maintenance of new [State Water Project] water diversion and conveyance facilities in the Delta" that "would divert up to 6,000 [cubic feet per second] of water from two new north Delta intakes . . . and convey it via a single tunnel . . . to a new pumping plant and aqueduct complex . . . in the south Delta, discharging it to the Bethany Reservoir for delivery to existing [State Water Project] export facilities." The main tunnel length is 45 miles. The tunnel project's purpose "is to restore and protect the reliability of State Water Project water deliveries and, potentially, Central Valley Project water deliveries south of the Delta . . . in a cost-effective manner."

In 2020, DWR adopted a Final Initial Study/Mitigated Negative Declaration (IS/MND) and approved certain initial geotechnical work, the purpose of which was to "collect data on soil conditions to help determine the composition, location, and geotechnical properties of rock and soil materials commonly found in and around the Delta." The information was sought in order to inform the project's design and alternatives selected for CEQA analysis. DWR also adopted two addenda to the IS/MND

11

and approved minor changes to the initial geotechnical work in 2021 and 2022, respectively. That initial geotechnical work is not at issue in this appeal.

In December 2023, DWR certified the project's final EIR and approved the project. Although the final EIR's Executive Summary section described the project as "consist[ing] of the construction, operation, and maintenance" of the above-described "water diversion and conveyance facilities," the Project Description section included additional preconstruction geotechnical work that was similar in nature to the initial geotechnical work covered by the IS/MND and subsequent addenda. The preconstruction geotechnical work set forth in the final EIR included the following:

Soil borings and cone penetration tests would be conducted at various locations "within the construction boundaries of the intakes, tunnel shafts, tunnel alignments, power lines, access roads and bridges, railroads, and levees." Each soil boring would be about 4 to 8 inches in diameter, would have a maximum depth of 250 feet, "and all soil borings not planned for completion as a groundwater monitoring well would be completely grouted following boring" to return the site to its pre-boring condition. The cone penetration tests would involve pushing "a cone-tipped rod with a diameter of 1 to 2 inches . . . through the ground." Those holes would also be "filled with grout following completion and prior to abandonment." "The information collected [from the soil borings and cone penetration tests] would be used to develop detailed design of the structure and bridge foundations, new or modified levee cross sections, ground improvement methodology," and various other design components, such as "selecti[ng] tunnel boring machine methods, dewatering methods and quantities, below-grade construction methods[,] . . . and methods to reduce ground settlement risk at all construction sites and along the tunnel alignment."

Groundwater testing and monitoring would be conducted using test wells installed at the tunnel shafts and intakes, at the Bethany Reservoir Pumping Plant and Surge Basin, and at two tunneled sections at the Bethany Reservoir. The test wells would be 12 inches

in diameter and would be installed in a borehole of 24 inches in diameter. Vibrating wire piezometers would be installed in several levee borings to measure groundwater pressure, and groundwater monitoring wells would also be installed in several site borings at each intake.

Test trenches "approximately 30 feet long, 3 feet wide, and 10 feet deep" would be excavated "at all the facilities to confirm near-surface soils and to investigate potential buried magnetic anomalies. Trenches would be immediately backfilled following observations of the soil conditions encountered in the trench." "Metal survey monuments would be installed at all construction sites and approximately every mile along the tunnel alignments to allow the remote monitoring of surface elevations prior to the start of construction, during construction, and during operations." These monuments would have a 10-foot by 10-foot base and would be 3 feet high to allow for satellite-based monitoring. Temporary in-river cofferdams would also be built as part of the pre-construction work, made of interlocking steel sheet piles, and would require "studies . . . to test pile installation and possible acoustic mitigation measures . . . ."

In addition, a fault study would be conducted at the Bethany Reservoir using " 'a linear array of removable small steel electrodes (approximately 0.5 inches in diameter by 8 inches long) driven into the ground approximately every 10 feet over several hundred feet to induce a low current in the ground, while a small readout unit [would provide] the measurements' . . . ." Those measurements "would be used to characterize subsurface soil characteristics above the . . . Bethany Reservoir Aqueduct tunnels."

As mentioned, the foregoing geotechnical work would be carried out prior to construction of the project. The purpose of the work would be to "advance the conceptual design" of the project and "collect data . . . to satisfy mitigation and monitoring requirements identified in the [final EIR]." The work was scheduled to begin in April and May 2024. Prior to commencement, DWR prepared a document titled

13

"Preconstruction Field Investigations Environmental Compliance, Clearance, and Monitoring Plan" in order to satisfy the final EIR's requirement that DWR adopt an "activity-specific environmental compliance monitoring plan" for each component of the project. Additional protective measures related to tribal cultural resources were contained in a separate document titled "Tribal Cultural Resources Management Plan."

Because this appeal involves only the propriety of engaging in preconstruction geotechnical work under the Delta Reform Act, we omit any further description of the project contained in the final EIR.

D

In 10 related actions, various municipal, tribal, and public interest entities challenged the tunnel project under CEQA and other statutes, including the Delta Reform Act. This appeal involves five of those related actions. The plaintiffs in those five actions include the City of Stockton (case No. 24WM000009), the Counties of San Joaquin, Contra Costa, Solano, and Yolo, the Contra Costa County Water Agency, the Central Delta Water Agency, and the Local Agencies of the North Delta (case No. 24WM000010), the Sacramento Area Sewer District (case No. 24WM000012), the County of Sacramento and the Sacramento County Water Agency (case No. 24WM000014), and San Francisco Baykeeper, Shingle Springs Band of Miwok Indians, California Indian Environmental Alliance, Restore the Delta, Golden State Salmon Association, and The Bay Institute (case No. 24WM000017).

In addition to alleging CEQA violations, each complaint alleged that the tunnel project violated the Delta Reform Act. We need not recount those allegations. It is sufficient to note that case No. 24WM000017 was filed after DWR began the preconstruction geotechnical work described above. The plaintiffs in case No. 24WM000017 alleged that DWR violated the Delta Reform Act by starting the work without first certifying that the tunnel project is consistent with the Delta Plan. They also filed a motion for preliminary injunction, seeking to enjoin DWR from proceeding with

14

the preconstruction geotechnical work "unless and until it complies with the mandates of the Delta Reform Act." They argued they were likely to prevail on their Delta Reform Act claim because (1) "it is undisputed that the [tunnel project] is a 'covered action' " within the meaning of the Delta Reform Act, (2) the preconstruction geotechnical work is "an inextricable part of the [tunnel project]" and thus part of the covered action, (3) engaging in such work amounts to " 'initiating the implementation of that covered action' " within the meaning of section 85225, and therefore, (4) DWR was required to certify consistency with the Delta Plan prior to engaging in preconstruction geotechnical work. The failure to do so, according to plaintiffs, resulted in a "clear and unambiguous violation of the [Delta Reform] Act's mandates." They also argued they would suffer irreparable physical and procedural harm if the requested injunction did not issue because (1) the challenged geotechnical work would result in environmental and cultural impacts, and (2) if DWR issued a certification of consistency before starting the work, plaintiffs could appeal the certification to the Council, resulting in an automatic stay pending resolution of the appeal. The plaintiffs in the other four related actions also filed motions for preliminary injunction making the same or similar arguments.

DWR opposed the motions for preliminary injunction. It acknowledged that the tunnel project "is a 'covered action' under the Delta Reform Act, which means that DWR will need to prepare and submit to the [Council] a 'certification of consistency' with the Delta Plan prior to 'initiating the implementation' of the [tunnel project]." However, DWR argued, the preconstruction geotechnical work, "which is necessary to inform DWR's ultimate design of the project," did not amount to initiating the implementation of the tunnel project. DWR argued: "The Council itself has made this clear. Its regulations refer to 'implementation' as separate from planning and designing activities. [Citations.] And the Council's published guidance—as well as Council staff's early consultation with DWR on this very project—stress the importance of finalizing planning and design before submitting a certification of consistency with the Delta Plan." (Italics omitted.)

15

Moreover, DWR argued that the trial court should not "conflate the definition of a CEQA project with the definition of a ['covered action'] under the Delta Reform Act" because the two statutory schemes "have different scopes." It noted that a CEQA project is only a "covered action" under the Delta Reform Act if "the project is covered by one or more provisions of the Delta Plan," but it asserted that the preconstruction geotechnical work "necessary to confirm alignment and design of [the tunnel project]" is also necessary "to identify[] the applicable provisions of the Delta Plan because many Delta Plan policies are location dependent." According to DWR, issuance of the requested preliminary injunctions would place it in a "catch-22" by enjoining it from gathering the geotechnical data it needs to prepare a certification of consistency to present to the Council.

DWR challenged plaintiffs' assertion that they would suffer irreparable harm without an injunction, and it argued that DWR would suffer such harm if the requested injunction issued. It claimed an injunction would increase the cost of the tunnel project, delay water supply and seismic resiliency benefits, and result in contractual penalties.

Plaintiffs filed their respective replies to DWR's opposition and the trial court held a hearing on the motions.

The trial court took the matter under submission and subsequently ruled in plaintiffs' favor, issuing the requested preliminary injunctions. It concluded plaintiffs had "a strong likelihood of success on the merits" because "the Legislature defined 'covered action' [in the Delta Reform Act] to mean 'project' as defined under CEQA," DWR's final EIR "defined [the project] to include the geotechnical work," and DWR's Notice of Determination also "described it as a 'key component' " of the project. Thus, "[b]ecause the geotechnical work is part of the 'project' within the meaning of CEQA, it is necessarily part of a 'covered action' within the meaning of . . . section 85225." The trial court rejected DWR's argument that the preconstruction geotechnical work merely served to inform the final design and did not amount to implementation under

16

section 85225. It ruled that the word "implementation" related to a "covered action," which it concluded is defined as the "project" under CEQA, and that the CEQA project in this case includes the geotechnical investigations. As for irreparable harm, the trial court determined that plaintiffs' strong likelihood of success on the merits required only "a minimal showing of likelihood of harm," which was satisfied due to "the procedural harm of being denied the opportunity to appeal [DWR's] certification" to the Council.

After the trial court issued the challenged preliminary injunctions, DWR approved a proposal from the tunnel project's Design and Construction Authority for a more limited set of preconstruction geotechnical tasks to be performed between 2024 and 2026, including 230 soil borings, 15 cone penetration tests, and 31 water quality tests at select soil boring sites. DWR also filed an ex parte application to modify or stay the preliminary injunctions to allow it to proceed with the 2024-2026 preconstruction geotechnical work, arguing the work would "cause no permanent adverse change to the Delta ecosystem," would "serve to inform critical planning and design" of the tunnel project, and is not, by itself, a covered action under the Delta Reform Act.

Plaintiffs opposed the ex parte application, again arguing that the relevant "covered action" under the Delta Reform Act was the tunnel project as a whole, including "all geotechnical activities identified in the [final EIR]." (Italics omitted.) Plaintiffs also argued that DWR was asking the trial court to usurp the Council's statutory authority to determine for itself, in an appeal from a certification of consistency, whether the preconstruction geotechnical work was covered by and consistent with the Delta Plan.

The trial court denied the ex parte application, concluding the scaled-down geotechnical work was still part of the covered action under section 85225, and DWR must still complete the certification process prior to engaging in preconstruction geotechnical work.

Thereafter, DWR submitted a certification of consistency to the Council for the 2024-2026 preconstruction geotechnical work. Plaintiffs appealed to the Council. The Council dismissed the appeals, concluding that it lacked jurisdiction because the 2024-2026 preconstruction geotechnical work was not a covered action under the Delta Reform Act. We will describe the Council's reasoning in the discussion portion of this opinion.

DISCUSSION

A

In order to obtain a preliminary injunction, a plaintiff must demonstrate that the defendant "should be restrained from the challenged activity pending trial." (*Prigmore v. City of Redding* (2012) 211 Cal.App.4th 1322, 1333.) To make this showing, plaintiffs were required to demonstrate "(1) a reasonable probability [they would] prevail on the merits and (2) that the harm to the plaintiff[s] resulting from a refusal to grant the preliminary injunction outweighs the harm to [DWR] from imposing the injunction. [Citation.] On appeal, a preliminary injunction will be overturned only on a showing of abuse of discretion." (*Ibid.*, fn. omitted.) However, "when the trial court's order involves the interpretation and application of a . . . statute, or case law, questions of law are raised and those questions of law are subject to de novo (i.e., independent) review on appeal. [Citation.] It is an abuse of discretion for a trial court to misinterpret or misapply the law." (*Id.* at pp. 1333-1334.)

The trial court's determination that plaintiffs demonstrated a reasonable probability of prevailing on the merits turns on its interpretation of section 85225, specifically, that "the plain language of [that section] requires [DWR] to prepare a certification of consistency prior to initiating the implementation of the [tunnel project], including its geotechnical component." Our review of that question of statutory interpretation is de novo.

18

## B

"In interpreting a statute, we begin with its text, as statutory language typically is the best and most reliable indicator of the Legislature's intended purpose. [Citations.] We consider the ordinary meaning of the language in question as well as the text of related provisions, terms used in other parts of the statute, and the structure of the statutory scheme. [Citations.] If the statutory language in question remains ambiguous after we consider its text and the statute's structure, then we may look to various extrinsic sources, such as legislative history, to assist us in gleaning the Legislature's intended purpose." (*Larkin v. Workers' Comp. Appeals Bd.* (2015) 62 Cal.4th 152, 157-158 (*Larkin*).) We may also look to " 'rules or maxims of construction "which serve as aids in the sense that they express familiar insights about conventional language usage." ' [Citation.]" (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1083.)

## C

As we explained in part B of the Background, the Delta Reform Act requires a covered action to be consistent with the Delta Plan. (§ 85022, subd. (a).) To help ensure such consistency, a state agency must submit a certification of consistency to the Council before implementing a covered action. (§ 85225.) As relevant here, a covered action is a project, as defined by Public Resources Code section 21065 (the CEQA definition of a project, i.e., an activity undertaken by a public agency that may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment) that meets all of the following conditions: it will occur within the boundaries of the Delta or Suisun Marsh; it will be carried out, approved, or funded by a state agency; it is covered by one or more provisions of the Delta Plan; and it will have a significant impact on achievement of one or both of the coequal goals of Delta management. (§ 85057.5, subd. (a).)

The parties agree that the tunnel project is a covered action, and the preconstruction geotechnical work is not. The dispute is whether the Delta Reform Act's certification of consistency requirement incorporates CEQA's whole-of-the-action requirement and prohibition against piecemealing, and thus prevents DWR from treating the preconstruction geotechnical work as separate and distinct from the tunnel project. We conclude the Delta Reform Act's certification of consistency requirement does not incorporate CEQA's whole-of-the-action requirement and prohibition against piecemealing.

The purposes of the two statutory schemes are different. It is true that environmental review of a project under CEQA must encompass the whole of an action affecting the environment, and a lead agency may not chop a large project into many little ones. (*Planning & Conservation League v. Department of Water Resources* (2024) 98 Cal.App.5th 726, 751.) But this is to ensure that the EIR "serve[s] its intended function of informing and guiding decision makers" about all reasonably foreseeable environmental effects before project approval. (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 130.) A Delta Reform Act certification of consistency, on the other hand, is prepared and submitted after project approval, but before the agency initiates implementation of a covered action. Unlike the EIR under CEQA, the certification of consistency does not serve as an informational document for use by the decision maker in selecting among project alternatives. Instead, it certifies that the covered action is consistent with the Delta Plan. We must be mindful about applying definitions and concepts from another area of law that serve a different purpose. (*King v. State Bd. of Equalization* (1972) 22 Cal.App.3d 1006, 1011.)

In addition, the preconstruction geotechnical work does not fall within the requirements of section 85057.5, and there is insufficient indication that the Legislature intended to incorporate CEQA's whole-of-the-action requirement and prohibition

20

against piecemealing into the Delta Reform Act consistency certification requirement. Because the Council has issued guidance on these points, we discuss that guidance in detail.

The Council is an independent state agency charged with adopting and implementing the Delta Plan. (*Delta Stewardship, supra*, 48 Cal.App.5th at p. 1038; §§ 85200, subd. (a), 85300, subd. (a).) Among other duties, the Council is tasked with deciding appeals challenging DWR's certification that a particular covered action is consistent with the Delta Plan. (*Delta Stewardship*, at p. 1044; §§ 85225.10, 85225.20.) After the trial court issued the challenged preliminary injunctions in this case, DWR prepared a certification of consistency for the 2024-2026 preconstruction geotechnical work, and plaintiffs appealed the certification to the Council. The Council issued a decision explaining that the preconstruction geotechnical work is not a covered action under the Delta Reform Act. It dismissed the appeal.

The decision from the Council was an adjudication of law by an administrative agency interpreting the statutes at issue in this case. (*Larkin, supra*, 62 Cal.4th at p. 158.) "We treat such adjudications as we do other official proceedings where agencies with relevant expertise, responsibility, and familiarity interpret a statute. [Citation.] To wit: we give great weight to interpretations like these, rendered in an official adjudicatory proceeding by an administrative body with considerable expertise interpreting and implementing a particular statutory scheme." (*Ibid*.) But we "retain ultimate responsibility for interpreting the relevant statute[s]." (*Ibid*.)

The Council concluded that the scope of a CEQA project is not necessarily coextensive with the scope of a covered action under the Delta Reform Act. Recognizing that a CEQA project encompasses "the whole of an action" (Cal. Code Regs., tit. 14, § 15378, subd. (a)), the Council explained that "where the Delta Reform Act and Council regulations intend to incorporate CEQA provisions, they do so expressly," and nowhere in the Delta Reform Act or the Council's regulations is that particular CEQA regulation,

21

or the whole of an action concept, incorporated into the definition of covered action. The Council stated that to be a covered action, an activity must not only be a plan, program, or project as defined in section 21065 of the Public Resources Code, but it must also satisfy the four additional requirements of the Delta Reform Act, including being covered by one or more Delta Plan regulatory policies and having a significant impact on one or both of the Delta Reform Act coequal goals. According to the Council, "Public Resources Code section 21065 simply states that a 'project' is an 'activity' that would cause a 'direct physical change' or 'reasonably foreseeable indirect physical change' in the environment. This is a very low bar and only the first element for what constitutes a covered action." The Council noted that the Delta Reform Act does not specify that a covered action must be certified together with all related activity in a single certification of consistency.

In addition, the Council explained that because CEQA's definition of a project "covers an extremely broad range of activities," a covered action within the meaning of the Delta Reform Act may "only be a subset of activity or multiple activities or sub-projects [within the broader] single project for CEQA. For example, a CEQA project may . . . include discrete actions not covered by any Delta Plan regulatory policy. The Council has appellate review authority only over those activities that meet all the criteria for a covered action." According to the Council, a public agency need only submit a certification of consistency for an activity that may cause a direct physical change or reasonably foreseeable indirect physical change in the environment, *and* the activity (1) will occur within the boundaries of the Delta or Suisun Marsh, (2) will be carried out, approved, or funded by the agency, (3) will be covered by one or more provisions of the Delta Plan, and (4) will significantly impact one or both of the Delta Reform Act's coequal goals. (§§ 85057.5, subd. (a), 85225.) The Council stated that the analytical framework set forth in its regulations established that the 2024-2026 preconstruction geotechnical work was not covered by any Delta Plan regulatory policies and was not

22

a covered action within the meaning of section 85057.5. (Cal. Code Regs., tit. 23, § 5001, subd. (o)(1), (mm).)

We assign great weight to the Council's statutory construction. (*Larkin, supra*, 62 Cal.4th at p. 158.) "It is the [Council] that is most likely to be ' "sensitive to the practical implications of one interpretation over another," ' and we give great weight to the [Council's] interpretation because of its expert knowledge of [the Delta Reform Act], and its role as the agency accountable for implementing the statutory scheme." (*Id.* at p. 163.)

Plaintiffs argue the Council's analysis was merely advisory. But we agree with it. (*Larkin, supra*, 62 Cal.4th at p. 158 [it is the court's responsibility to interpret the relevant statutes].) The Council's statutory construction best advances the Legislature's intended purpose. (*Id.* at pp. 163-164.) Among other things, the Legislature indicated that decisions made under the Delta Reform Act must be supported by the best scientific data available. Section 85225 requires the certification of consistency to include "detailed findings as to whether the covered action is consistent with the Delta Plan." The Delta Reform Act also requires the Council, in implementing the Delta Plan, to "make use of the best available science" (§ 85302, subd. (g)), and further requires the "detailed findings" contained in the certification of consistency to "document use of best available science." (Cal. Code Regs., tit. 23, § 5002, subd. (b)(3); see also Cal. Code Regs., tit. 23, § 5006, subd. (b)(2), (3), (4).) " 'Best available science' means the best scientific information and data for informing management and policy decisions." (Cal. Code Regs., tit. 23, § 5001, subd. (g).) The record supports a conclusion that the preconstruction geotechnical work will inform the ultimate design of the tunnel project and allow DWR to include detailed findings and document the use of best available science when it ultimately submits the certification of consistency that it acknowledges must be submitted prior to starting construction on the tunnel project.

23

Plaintiffs nevertheless argue that declarations submitted by DWR in opposition to the preliminary injunction motions do not demonstrate that the geotechnical work is *necessary* to support overall tunnel project consistency with the Delta Plan. However, as plaintiffs acknowledge, the "geotechnical data could potentially support design refinement." If that design refinement were to reduce the overall footprint for certain aspects of the tunnel project, that information would allow DWR to demonstrate consistency with the regulatory policy requiring water facilities to "be sited to avoid or reduce conflicts with existing uses." (Cal. Code Regs., tit. 23, § 5011, subd. (a).) We need not set forth each regulatory policy and determine whether or not the geotechnical work would assist DWR to demonstrate consistency with that specific policy. We simply note that whether necessary or not, the data to be obtained from the geotechnical work would be useful to DWR's preparation of the ultimate certification of consistency. Allowing the preconstruction geotechnical work to proceed advances the requirements that DWR use the best available science and set forth detailed findings in that certification.

The Delta Reform Act does not require DWR to submit a certification of consistency before engaging in preconstruction geotechnical work. Thus, plaintiffs have not demonstrated a reasonable probability of prevailing on the merits. And because the procedural posture of the case has changed, the trial court should reassess and rebalance the probability of prevailing against any showing of harm presented by plaintiffs on remand. (*Tulare Lake Canal Co. v. Stratford Public Utility Dist.* (2023) 92 Cal.App.5th 380, 417 [the balancing of relative harms is often best completed by the trial court].)

## DISPOSITION

The June 20, 2024 orders granting plaintiffs' motions for preliminary injunction are reversed. The matters are remanded to the trial court with directions to vacate those orders and reconsider plaintiffs' motions in light of this court's conclusion that the Delta

24

Reform Act does not require DWR to submit a certification of consistency before engaging in preconstruction geotechnical work.  DWR shall recover its costs on appeal.

/S/
MAURO, Acting P. J.

We concur:

/S/
KRAUSE, J.

/S/
WISEMAN, J.*

---

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.